Our second case is 22-1271, Wall Recycling, LLC v. 3TEK Global, LLC. Mr. Anthony, whenever you're ready. Thank you, Your Honor. May it please the Court, my name is Keith Anthony. I represent WallTEK Recycling. The question before this that would preclude a summary judgment in favor of 3TEK on the grounds of whether 3TEK waived a contractual requirement that the parties sign a separate sales contract and also whether the parties mutually agreed to cancel this purchase contract, which we refer to as the February agreement. I'm going to address the waiver issue with regards to the sales contract. And I think as you look at this issue and consider the facts, it's important to understand that there's really a few different agreements that we're talking about. There's this original agreement that we call the February agreement. It's the one that has these conditions precedent that to exercise this option to purchase a certain production unit, in this case production unit number two, you had to pay the remaining 20 percent deposit, which in this case was $359,000, so a total of $459,000 to be paid, which Wall Recycling did. You want to call that a second agreement? The first one you called a February agreement. Correct. That was signed in February of 2019. What's the second one called? It's a sales contract, and that's what the condition is. A sales contract? Correct. Does it have a date on it? It was dated... Was it ever signed by anybody? It was not. It was sent to Wall Recycling in April of 2019. You're admitting that it's an agreement? That's what it's called. That's just the title of the document. It's a sales contract. You said there were two agreements here. That's what bothers me. I thought you were challenging the fact that there was an agreement in the sales contract. And I appreciate the distinction there. There's three documents that we're talking about. The February agreement, this sales contract that was not signed, that we say was waived, that although the original February agreement called for a sales contract to be signed, that that was waived. And then the third document that also was not signed is sort of called a sales contract as well. This was presented in February of 2020, so a year after the original February agreement. 3TEC contends that this agreement in February of 2020 is essentially the sales contract. That in order for Wall Recycling to move forward with the purchase of this machine, it had to pay the deposit, nearly half a million dollars, which Wall Recycling did, and then sign a sales contract. Our position in all of this is that there was a little bit of a discussion about a sales contract for a brief period of time in April and May of 2019. And then for a period of time, there was no reference to this sales contract. How does that affect the waiver? I mean, the fact that it might not have been discussed doesn't mean that someone affirmatively waived the obligation to have a sales contract signed as part of this deal. Well, it goes to the waiver can be implied by the actions of the parties. And here, everybody was moving forward towards this actual sale and delivery. But where in the record does it show that they were moving forward with the understanding that there would be no need for a sales contract? Well, a waiver occurs when there is a lulling of a party to believe that strict compliance is not going to be required. For example, in the... So where is that evidence in the record? So if... The lulling. Yes. If constant, you know, we're moving forward with this... Okay, so that's it? That you're moving forward? Well, it's part of it. So they're moving forward, they're going, having an on-site visit, which doesn't occur unless there's a sales contract required. Why is that? So Matt Morrison, who is the president of 3TAC, testified that, here's our process. We sign this initial document, we then require the 20% deposit, require a sales contract. After all that occurs, we schedule a date for delivery, we have an on-site meeting where we go over all the logistics for delivery, for setting up the machine, the shredder, and then we deliver it. And so we got to the... Was your client aware of that understanding, that that's how the process worked? Or do they have to be aware in order for a waiver to take effect? They have to understand and see what actions are being presented. I understand that, but you seem to be suggesting that because 3TAC had this internal process by which they said, by the time you're down on the factory floor, if you don't have a sales contract in hand, you've effectively waived it. But did your client have that understanding? Waiver is the intentional relinquishment. But it has to be two ways, doesn't it? It does. And so, well, it needs to be that 3TAC needs to say, we're no longer requiring it. Yeah. Well, I don't know if Wahl has to agree with that, but it's 3TAC's right under this agreement that we have the right to require a sales contract. They can unilaterally say, we're going to waive it. Anthony, can I take a step back, that I've just realized something is confusing the heck out of me? At what point do you think there was a binding agreement to sell, for them to sell and for you to buy a shredder? At what point is there a contract? Upon the waiver, which we occur, certainly happened... Wait, wait, wait, hold on. But what's the contract at that point? The contract is the February agreement. How is that a contract to buy and sell a shredder, as opposed to an option contract where your client can buy a shredder if he wants, and they would have to give him the shredder? How is that a contract to buy a shredder? If you look at all the terms of the agreement, this is a detailed contract. It's 11 pages. Okay, so let me just make sure I'm implicit. So, if it was a contract to buy the shredder, imagine that your client didn't exercise the option, right? If your client chose not to, because he had the right to exercise the option, but he didn't have to exercise the option. So say he doesn't exercise the option. And then say they offer him the next shredder and he doesn't exercise the option. They offer him the next shredder and he doesn't exercise the option. Because he says, you know what, it turns out I've decided not to buy a shredder after all. They could sue him for breach of contract then, right? Well, the contract expires. It had a provision for expiring at the end of the year if it wasn't exercised. End of 2019. But I guess the implication is that if the February agreement isn't just an option, it's an actual sales contract, then they could have sued him for breach if he hadn't bought one? If it's a binding contract, then yes, you have the possibility of that. But it was exercised in terms of $459,000 was paid, nearly half a million dollars that continued to proceed forward and talk to Wahl Recycling as though this deal is going forward, that this is your shredder. So can I go back to the waiver and specifically on the point that Chief asked you? I want you to limit yourself to before September of 2019. What is your best evidence of waiver before September of 2019? Before September of 2019? In other words, before that your client is saying it actually turns out I don't want it anymore. What is your best evidence of waiver before that happened? The last communication about it occurred in May of 2019, May 30th. There was follow-up from Bill Padula to RJ Smith and said, we're still looking for this contract. So at this point it had not been... Wait, the lulling is to say we're still looking for you to sell us something? I'm saying as of May 30th, it would not have been waived yet. As of May 30th, 3TEC was saying we still want a sales contract. So them saying... Okay, so make sure I understand this. In May they say we still need the contract. Right. So there's no waiver at that point. Crickets. And they're the ones who say we want the contract. And then there are crickets for like all summer long. And you think they waived by not sending another email saying we still want the contract? No. Our argument is that the waiver occurred, the time period that demonstrates waiver is from May all the way till February of the following year. Sure. You want us to... You're saying then that you're... The judge gave them summary judgment and you're appealing. That's correct. You want us to reverse that and give you summary judgment or do you want a trial? We want a trial. We think this is a jury issue. So you want a trial on the factual issue of waiver? Correct. That's all you want? Correct. We think there are enough facts to demonstrate that there is waiver when you look at this entire time period. It's eight plus months. So we're not focused on from May till September, May till October. We're focused on May through February, eight plus months where there is no requirement that they sign a sales contract. So I understand you're focused on it, but once we get to September, then we have the whole problem of your client saying, it turns out I don't want the Schrader anymore. Correct. Which seems to massively complicate the waiver now because I guess I'll say, if your client repudiated, then there's no more waiver because we repudiated the contract, right? And there we don't... We think there are factual issues as to whether or not that occurred. Well, there's not factual issues that he sent him an email saying, I don't want the Schrader anymore. And he said, I need my money back in full. And he says, enough time has passed. You promised it. You didn't get it to me where you said, when you said you were going to get it to me. I am losing money. Give me my money back now. Essentially, he didn't say this part, but essentially what he's saying is, so I can go purchase another Schrader somewhere else from somebody else. Isn't that the problem? He didn't say that. He said, I want my money back. And the other side said, okay, fine. The contract is rescinded. We can't give you your money back right away. We can only give you a hundred thousand. We'll pay the rest with interest. But it doesn't change the fact that the parties agreed to rescind the agreement. The question then is, in the absence of any explicit agreement as to when the refund would be in your client's hand, isn't that an issue of performance with respect to when the refund was to be returned? No. We think it goes to whether or not there actually was an agreement to rescind. You have a material term in terms of the timing of that refund. We said, refund it. And 3TAC said, can't really refund it right now. We will at some point. Didn't say with interest. Yeah, I don't know about that. I mean, I think it's a pretty basic principle of contract law that in the absence of a term of payment, that the payment is due within a reasonable time. And that's what happened here. There was no agreement. There was an agreement to rescind, no agreement as to when the refund was to be returned. And so the parties are then left to assess what a reasonable time period is. So what's your best case that that isn't the law? That it's a material term. I think the district court couched all of this under the UCC and said, look at UCC Article 1, references a reasonable time as being the period. We're talking about a rescission, which is an agreement to rescind, which is not an agreement for a sale of goods. It's actually not UCC. Okay, but even under the common law, isn't that the test? Common law is more strict than under the UCC. Common law requires a meeting of the minds of material terms. And what we're saying is that this, in fact, is a material term. That if it's not a material term, the common law will imply a reasonable standard. But this is material. Dan Wall, on behalf of Wall Recycling, is saying, we want it back. And again, I understand he didn't say in his email immediately, but it was clear from the implication, and we think this creates a factual issue to be tried, that he wanted it back so he could go get a different shredder. And here's 3TAC saying, no, we're going to give it back to you when we can, an open commitment. Wasn't there crickets, to quote Judge Heitens again after that? The communication was not the best. It seems like, to the extent people keep dropping the ball here, it's your client. Again and again and again, they say we want information, and again and again and again, he doesn't respond to them. It would have been helpful had he responded further. I acknowledge that. However, you also have to look at who else dropped the ball. In our view, 3TAC dropped the ball, too. They could have refunded the money. They didn't. They say, well, you didn't follow the wiring instructions. How did they refund the money? You want to cut a check for a huge amount of money? That's what they did at the end. Well, they eventually did because your client never sent them wiring instructions. They could, though. There's nothing that precluded them from doing that. But if they had originally cut a check, your client might have said, I can't believe you possibly sent that much money via personal check. That's shockingly irresponsible. Well, it does happen. That's not uncommon. Yes, it's often wired, but the fact that a half a million dollar check is sent doesn't strike me as that unreasonable. But at the same time, the parties did continue forward. And I think that's what you have to look at here is that what is the intent of the parties? What's the understanding of the parties? They're moving forward. Moving forward on what? The original deal or a new deal? We think there's a factual issue there. And so if you look at the facts related to that, what 3TAC tries to say is this is a new deal. Now, if it's a new deal, there is a process that 3TAC goes through. They do the sales quote. They collect the deposit up front. This new representative, Jonathan Maley, never sent over the initial document. And he could have emailed it to him. He eventually emailed another document, which we call the final contract, and that's where it gets confusing. That's a totally different document. It's not the sales contract. It's almost the exact same document as the February agreement, just minus these condition precedents. So it shows that 3TAC was willing to enter into a final binding sale without the sales contract. I mean, that is waiver, saying if you sign this, we'll do a deal. It's final. We'll ship you the machine. And that final document is not the sales contract. It's identical to what was signed in February of 2019. It just drops the condition precedent. That's the only material difference. And so if you look at what is transpiring, it's clear that 3TAC is going forward with this transaction. And Wahl understands that. And they're allowing 3TAC to have their money. There are enough facts there when you look at the totality of this and what's actually going on with the parties that a jury can look at that and say, we find that there was waiver and that there was no cancellation. All right. Thank you, Mr. Anthony. You've got some time left for rebuttal. Mr. McComber? May it please the Court, Your Honor. Ryan McComber. I'm here for Apple E3TAC Global LLC. Good morning. The Court did not err in granting summary judgment in favor of our client. And I think to start out, I think it's important to revisit what Wahl sued my client for. The contract that they claimed they sued my client on was this February agreement, which he's referenced to the Court. But that agreement is not the same agreement that was signed in February. He claims there are three modifications to that agreement, including the fact that my client would pay for the assembly, there would be a parts credit, and I think most importantly that we agreed to a 10% discount, a substantial discount off the price that is reflected in that agreement. Ultimately, the Court entered summary judgment because he sued on that deal. He got offered that deal in February of 2020, and he rejected it. The problems going forward, and I think why the Court did not err in granting the summary judgment, are really fivefold. First, and most importantly, I think there's lack of mutual assent to that term. There was absolutely no evidence of an agreement by 3TEC to that 10% discount in May of 2019 when they were discussing that. Even Wahl's representative, Mr. Smith, at that time said, I think we're close to an agreement, let me talk to Dan. And then as the Court has referenced, there were crickets. Second, there was no breach of this quotation, even if you think that there was some enforceable agreement that the parties had a meeting of the minds on. The quotation is clear in its terms. The quotation requires not only that the down payment be made when you elect the option to purchase that machine, but that you also sign a sales contract. And then really the most important factor after that becomes we have the obligation to pledge a firm shipment date at that time. And once those conditions present are met, that is the action we would take. This is a multi-ton, multi-million dollar machine that has to be prepared for shipment. There's shipping that has to take place, taking it to the facility. It requires cranes. It's an immense process. In no time did we ever make that available for shipment without signing an agreement that was reflected in that quotation. And in no time did we ship it to their facility or was it even arranged that any of this was going to occur. I thought I saw at one point you agreed to ship it on January 24th. Is that wrong? It is wrong, Your Honor. I will say the frustrating part about salespeople is they continue to talk about when this piece of equipment is going to be available for shipment. And as you can see, even as you start with the quotations, it's anticipated that it's going to be that summer, the next year. It goes from July, August, September. And it goes through. And really it's not, these are not probably in some instances the greatest use of language, but it's mere puffing about when we're going to try to get this done. It's not consistent with a pledged firm date that they can come pick it up. Puffing, is that what you said? It was, Your Honor. And you aren't bound by what he said. Absolutely not, Your Honor. Contractually, what you see in those... They shouldn't have been expected to leave you. Absolutely not. And I think it's reflected in the termination that you see from Mr. Wall sent in October. He's like, you promised me this date, you promised me the next date. It's clear you're not going to get it by the end of the year. I want my money back. How do I know if something's, I mean, as a person who's gotten things after what I thought was a firm ship date, how is the purchaser supposed to know if it's a firm ship date versus a puffery ship? Like, what's the legal distinction between a puffery ship date and a real ship date? And absolutely, I think at the end of the day, what it is is what these parties understood was a pledged firm ship date was the date that piece of equipment could actually be picked up at the facility and was ready to be shipped to the new location so they could make those arrangements. And we would pledge that firm date. And obviously, if we did not meet it, that would be a breach of our agreement in order to provide that firm ship date. These other dates are discussing simply, and I think to back up, it's important to remember these machines are being created not for a specific customer. They're almost on an assembly line as if they're being created and then people are given the option to purchase them. And repeatedly, as you can see from the communications with Mr. Wall, when he's pressing to know when this firm ship date may be, they say, come down to the facility. We'll talk to you about where we're at in the process and then we can talk about where we anticipate it would be available to be shipped. Mr. Anthony says that there are certain processes in the way your client handles these sales, some of which would not have occurred. Well, a precondition of their occurring would have been the signing of a sales contract. He mentioned a couple of them and that that evinces a waiver because they occurred without the signing of a sales contract. So what about that? And thank you, Your Honor. I don't agree that that is correct. Ultimately, the rights are what we're waiving. In our contract, there's nothing in there that says that our right somehow says that we have to follow our processes and if we don't follow our processes, we're waiving this obligation. The testimony was pretty clear that the typical practice is that that's the last thing that occurs. Unfortunately, for... What is the last thing? The last thing that occurs would be that there would ultimately be a site visit and then after that site visit... Which normally would not happen without a signed contract. Absolutely. That had been the history of these type of transactions. The part about it that I think gets missed when you... Did the February agreement say that? Did the February agreement say that there would be a site visit? That there would have to be a sales contract or whatever you called it there a minute ago. That this is not the real deal. You have to have a sales contract. Absolutely not, Your Honor. I think that's an important distinction from what you have in our option contract that started in February. The February agreement is the only one that was signed. Correct, Your Honor. And in February 2019, that was the signed option agreement. Ultimately, and I think importantly... If it's not the February agreement, we don't know. Exactly. There is no agreement if it's not February. And counsel has not planned a cause of action other than... Besides, we're doing a lot of things. Building the big machine and paying hundreds of thousands of dollars and negotiating and talking to one another and your salesman's going up there and tell them it's going to come on January 24th. There's a lot of conversations. You have to have some kind of a deal or no deal. And I think the important part about that is there's no deal because... Well, you've got a signed contract. Intermixed in that. February 2019 was signed by both sides. It was, Your Honor. That option contract was signed and then it was terminated in October of 2019. You called it an option contract. He calls it a sales contract, I think. He didn't even agree on what you call it. Well, he agrees it was... It says on the top. It says a quotation. It says quotation. Yes, and our position has always been that that was a sales quotation. I understand what your position is. Yeah. I mean, I think I do. But I'm assuming you're like ships in the night. Well, I'll say he does agree it was initially an option contract. And usually, if you've got lawyerships in the night about what the facts are, they're disputed. The question is whether they're material enough with regard to the summary judgment award to require a jury to figure it out. And I agree, Your Honor. I think initially... That's all that they're... This is complicated and factually in some... It's a jury trial. And, Your Honor, I know they do want a jury trial. I don't think they're entitled to it based on this evidence. I think the judge was thorough. I'm not saying that I've decided to go along with it at all. But I'm characterizing... I'm putting you in a tougher position. That's what I'm trying to do. I appreciate that, Your Honor. I will say we agree. When they started, they agreed that was an option contract. Ultimately, they want to change it to an actual contract by saying we waived the provision that essentially takes the option away. So to narrow what we have to do, I understand your first-order position is it's a quotation or option contract. You agree the district court's decision proceeds under the assumption the February agreement was a contract initially. Well, or was a contract that had conditions precedent that had to be met, including the signing of the sales contract, right? Correct, Your Honor. But the district court... Had they paid the deposit and had they signed the sales contract, that would have been a binding contract to sell the machine and that you would have been... Another way to think about it is if they had paid the deposit and signed the sales contract, in the district court's view, you would have been required to sell the machine in that situation. Yes, Your Honor, pursuant to the terms of the subsequently signed contract. I'm not sure I read the district court judge as saying that. Right. But fair enough. I had one other question about... So, I mean, there's a couple ways to think about it. Was there a contract initially? If there was a contract, was it rescinded? And if it was rescinded, was it reinstated? Right? There's like the three order of questions there. So can I ask you a question about reinstatement? And that's what's going on... Not the first February, the later January and February. So we get to this point where there's reference to a January 24th ship date. You conduct... There's a site visit in February. And all the while, you still have his deposit. Why isn't that enough to create a genuine issue of material fact about whether the parties had reinstated their agreement by that point? Because I don't know on what basis you're still holding his money and why we're conducting site visits if we don't have a contract. And I think really the answer to that is we asked to be provided with the wiring instructions. Obviously, they were not provided. Do you know how to write a check? I do believe they do, Your Honor. I could have written a check for $459,000 or whatever it was. There's no law requirement in the law that a refund has to be wired. I agree, Your Honor. That's just the way that the facts lay out. That's what they chose to communicate. And he said, I'll provide the wiring instructions. That's just a dodge. No. And then essentially... I'd like to figure it out. I agree. I agree. That would have been a lot easier if they'd sent the check at that time for sure. Ultimately, they didn't respond to that last correspondence, and I think it's consistent with their conduct throughout this. Every time we ask for information to follow up... We generally don't provide even tentative ship dates to people who don't have an agreement to buy something, right? And we generally don't conduct site visits for people who don't have an agreement to buy things. And maybe you've got arguments, but why isn't at least that an argument in favor of... It seems like you reinstated whatever agreement that existed in the past. Well, at the end of the day, the agreement in the past, the court clearly held, even if it was reinstated, it did not do away with this requirement that there be a sales contract be signed. And so we think the agreement went away to the extent there's proof that that was reinstated, which the only proof there is is... You agree there was a rescission. Yes, there was a rescission. You agree there was a contract and it was rescinded. It was rescinded mutually. It was rescinded orally. It was in writing. That was not signed. It was not signed. It was an exchange of emails. It wasn't rescinded by a written agreement. It wasn't a written rescission because it was not signed. The only thing that was signed, that's what I've been told here this morning, is the February 19th agreement. That was signed by both sides. Correct, Your Honor. That's the agreement. It's the only agreement I can see. I mean, the only written agreement. And then the record in October of 2019 when Wall requests the refund of the money, that was met with an immediate email response from 3TEC saying we accept your agreement to terminate. And in writing, through email, there was no signed written document confirming the mutual rescission. But at that point, there was clearly a mutuality that reached the point of being a mutual agreement to rescind, which would have given them the opportunity if the money was not returned in a reasonable time to file suit and recover those funds. How much money were you talking about at that time? All of it? That would have been all of it, Your Honor. $459,000? Mr. McCumber, Judge Hyten has raised an interesting question about whether or not there might be a genuine dispute, a fact as to a new agreement post rescission. But as I understand the complaint, the complaint is only for a breach of contract for the February agreement. Is that right? That's absolutely right, Your Honor. And I think that was where they confirmed that's our agreement, we're sticking to it. And there's no claim that this last series of negotiations was a contract or that your client breached that new contract if it was a contract? That's correct, Your Honor. In fact, the only claim was that somehow that February agreement was somehow revived as we got to the end of 2019 going into 2020 and whether we were required to perform under that contract at that time. And ultimately, the court said if that agreement did revive, that there was no waiver of our requirement of a signed sales contract. And I think that's evidenced by the communications. Again, the silence on Wall's side versus the text messages from our side on two occasions indicating can we get an agreement signed. Ultimately, our internal communications indicating that John Malley was continuing to try to get an agreement signed so they could close the deal. And I think the testimony is very clear from Matt Morrison. That piece of equipment was not leaving our property without getting the remaining 75% of the contract and having a signed contract in place, and it ultimately never did. And I think that's where the problem with the waiver comes in. The only thing that we could have done would be to deliver this product, deliver this piece of equipment, make it available to ship, and ultimately pledge a firm ship date. And none of those things occurred, and that's admitted in the record by Wall. Is it correct that both sides agree that North Carolina law applies here? This is a state law case. Yeah. No federal law involved here. It's here on diversity, right? Yes, Your Honor. And the UCC would govern the sale of goods. And I think the other thing that is important in addition to climbing these hurdles of not having an enforceable contract, no mutual agreement, and not finding waiver, the UCC does allow for a timely retraction even if you did not initially require strict compliance with an agreement. And so I think that another problem that the court addressed was that even if you get us all the way to the finish line here and you found that there was a contract, and that was the February 19 agreement, you found that we somehow waived the condition precedent of receiving the signed sales contract before we were going to give them the requirement that we send them the equipment and sell it to them, we're still allowed, if there's not a material change in reliance on that waiver, to say, no, we want strict compliance. And I think as you lead up to where we ultimately did that, demanded strict compliance again, you see in February we send the contract. You've got Mr. Wall at Wall blowing up because he's upset that he lost his place in line with respect to how the equipment was being rolled out, which is consistent with the right of first refusal in the February agreement they're suing on because they didn't fulfill their requirements. They got skipped. And he's upset about that. And so it's made very clear at that point. There's an email that says, look, if you want to do this deal, John Malley sends the email, you're going to sign the contract, and you're going to deposit the 75% remaining on Monday. And that's what we're going to do. And that was strict compliance with the requirements of that agreement as it was initially signed and as they sued us here. And what do they do? They don't respond to that with an assigned agreement. They come back with legal counsel involved and said, here's what you have previously offered and here's what we want to do, which included this 10% discount that we did not agree to. And we did not accept that offer. They did not strictly comply. And if anything, even if there was waiver, even if there's a portion of agreement, we timely retracted it because everything in that agreement was, frankly, the deal that they're now suing on. They didn't change materially on any requirement. And, in fact, Mr. Wall testified very open and honestly. I had no problem signing an agreement. And he understood from the beginning that that was a part of the agreement and understood what those terms said. They now claim that we waived that requirement. But he said he didn't have a problem doing it. So what could he have done in reliance on some waiver of our requirement to require a contract that was detrimental to him? There's just nothing and no evidence of that. So I think the court found multiple avenues for why they can't get there, even on these waiver arguments, because at the end of the day there was a timely retraction under the UCC. So for all these reasons, I think we pray that the court would affirm the judgment in all respects. Thank you, Your Honor. Thank you, Mr. McComber. Mr. Anthony? Thank you. I'd like to address a few points, specifically with regards to the rescission. It is our view that the original February agreement is the contract. It is the one that we sued for. We believe that has stayed in effect. On rescission, we believe that the evidence shows that there was not a mutual agreement because you have a material term regarding the timing of when this money is going to be refunded that was not agreed upon. Or sort of worst-case scenario, even to the extent that there was some kind of understanding of some degree that the parties sort of withdrew that and moved forward with the same contract. We think there's evidence in the record to show that it's the same contract. If you look at the email that was sent from Jonathan Maley in November to Dan Wall, this is where he's asking for confirmation from Dan that Dan doesn't provide. But he says, you know, send me an email stating that you are still intent on moving forward with the purchase of the 6280, that's this machine, that is being manufactured by the end of the year. The last communication we have of record was that a refund for the deposit. I just have to have T's crossed and I's dotted. This is a carefully thought out email. This is for corporate saying, you know, we need to have a clear record of this. But as you look at that, he's talking not about a new contract. He's talking about still going forward with, going forward with an existing contract. And, again, doesn't send Dan Wall or Wall Recycling a new quotation as though this is a new contract. Doesn't follow that same process. Doesn't say, hey, we're going to now give you production unit number three. He goes forward as though we're still talking about the same deal. And we think that there is sufficient evidence. A jury looking at all of that would agree that either this was not rescinded because there was no mutuality or the parties agreed that they were moving forward with this same transaction. With regards to the argument that this was timely retracted if there was a waiver, what he's talking about is this demand that you sign this agreement in February 2020. And I do think that this is an important point. We've got in the record that February 2020 agreement. But there's also a red line of it starting at Joint Appendix 2347. And that red line is a comparison of this agreement set in February 2020 to the contract that we are suing under from February of 2019. And if you look at it, they're virtually identical. There's a few changes because the machine has now got an updated name, the Bravo versus the next 6280. There are a couple of little minor specs that are just changed. But the only real difference is that this condition precedence that you will have to pay the full 20% deposit and sign a separate sales contract are removed. Otherwise, it's the exact same contract. Compare that to the sales contract, the one that they say that they required. They're different contracts. That has different terms. It has additional terms related to warranties. There's choice of law, choice of forum provision, a number of provisions like that. So when they come in February of 2020 and say you need to sign a sales contract, it's not the sales contract that they said we had to sign earlier. That is, by definition, a waiver. We're not saying you have to sign that one that we said you previously had to sign. What you have to sign is the exact same thing that you signed before minus these two provisions. So in our view, that is waiver. Ultimately, as we look at this, this is a contract dispute. And a contract is about the intent of the parties. What did the parties intend? And you can see that through the writings. You can see it through the course of conduct. And the course of conduct here shows that the parties were acting as though that there was a contract in place to purchase this for an extended period of times. All of the actions that Dan Wall saw was though they were going, 3TAC was going forward with the transaction, even though there was no separate signed sales contract. Dan Wall relied upon that. They had the meeting in early February. They worked on all the logistics. Dan accumulated material that he was going to run through the shredder. All of that is sufficient to show that there was an understanding and that was the intent of the parties. And we think that's enough to go to a jury on both of those issues. Therefore, we request that the court reverse the district court. Thank you, Your Honors. Thank you, Mr. Anthony. Thank you both for your arguments. We'll come down and agree counsel and adjourn for the week. This honorable court stands adjourned. Sign and die, God save the United States and this honorable court.
judges: Albert Diaz, Robert B. King, Toby J. Heytens